# United States Court of Appeals
## For the First Circuit

No. 10-1972

SAFEGUARDING THE HISTORIC HANSCOM AREA'S
IRREPLACEABLE RESOURCES, INC., ET AL.,

Petitioners,

v.

FEDERAL AVIATION ADMINISTRATION,

Respondent,

_____

MASSACHUSETTS PORT AUTHORITY,

Intervenor.

_____

PETITION FOR REVIEW OF AN ORDER OF THE

FEDERAL AVIATION ADMINISTRATION

Before

Torruella, Selya and Lipez, Circuit Judges.

Matthew F. Pawa, with whom Law Offices of Matthew F. Pawa, P.C., Jonathan S. Klavens, and Klavens Law Group, P.C. were on brief, for petitioners.
Elizabeth S. Merritt, Stephen F. Hinchman, and Law Offices of Stephen F. Hinchman, LLC on consolidated brief for National Trust for Historic Preservation; Representatives Markey, Tierney, and Tsongas; Boards of Selectmen of Towns of Bedford, Concord, Lexington, and Lincoln; Hanscom Area Towns Committee; National Parks Conservation Association; and Friends of Minute Man National Park, amici curiae.
Brian C. Toth, Attorney, Appellate Section, Environment & Natural Resources Division, U.S. Department of Justice, with whom Ignacia S. Moreno, Assistant Attorney General, John R. Donnelly,

and <u>Lisa A. Holden</u> were on brief, for respondent.

   <u>Martin R. Healy</u>, with whom <u>Michael K. Murray</u>, <u>Goodwin Procter
LLP</u>, <u>David S. Mackey</u>, Chief Legal Counsel, and <u>Ira M. Wallach</u>,
Associate Chief Legal Counsel, were on brief, for intervenor.

---

July 12, 2011

---

**SELYA**, **Circuit Judge**.  The area around the venerable towns of Lexington and Concord is commonly regarded as the birthplace of the American Revolution.  The communities in that area, now fashionable Boston suburbs, are deservedly proud of both their storied history and their aesthetic advantages.  When an affiliated arm of the state government — the Massachusetts Port Authority (Massport) — sought to modernize a mixed-use airport in the vicinity, a phalanx of preservationist organizations and concerned citizens treated the move as a call to arms.  Massport nevertheless pushed ahead with its desired project and asked the Federal Aviation Administration (FAA) to authorize the demolition of an existing hangar and allow the development of a state-of-the-art fixed base operator (FBO) facility.  The upshot was an epic battle fought with statutes, regulations, legal precedents, and expert reports.

The results of this battle are now before us by way of a petition for judicial review of the FAA's order permitting the project to proceed.  The protagonists are ably represented, and the petitioners have raised a gallimaufry of issues involving the Department of Transportation Act, 49 U.S.C. § 303(c), the National Historic Preservation Act (NHPA), 16 U.S.C. § 470f, and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4347.  After careful consideration of the parties' briefs and oral arguments, helpful submissions by amici, and an amplitudinous

-3-

administrative record, we conclude that the painstaking process conducted by the FAA comported with its responsibilities under the dizzying array of applicable statutes and regulations. Accordingly, we deny the petition.

## I.   BACKGROUND

Laurence G. Hanscom Field (Hanscom) is a general aviation airport located in Bedford, Massachusetts.  The area teems with a rich cornucopia of historically significant sites, including Minute Man National Historical Park and Walden Pond (a designated national historic landmark).

During the middle of the twentieth century, the Army Air Corps leased and operated Hanscom.  Later, the facility morphed into a joint military and civilian operation.  Among other things, Hanscom now serves as a relief valve for Logan International Airport (the major airport in the Boston area), allowing Logan to concentrate on large-scale commercial flights.

Massport is an independent state authority established under Massachusetts law, see 1956 Mass. Acts ch. 465, §§ 1-35, which has operated Hanscom's civilian component since 1974. Massport has intervened in these proceedings and staunchly defends the FAA's decision to allow the requested demolition and subsequent new construction.

The focal point of the parties' dispute is Hangar 24, which was originally built in Georgia, shipped to Massachusetts,

and reconstructed at Hanscom in 1948. For several decades, Massachusetts Institute of Technology (MIT) leased the structure and used it as a research facility. In 2001, MIT deemed it unsuitable for that purpose. The hangar has been vacant ever since.

Responding to a perceived demand for increased corporate aircraft services at Hanscom, Massport issued a request for proposals to redevelop the Hangar 24 site. In 2005, it blessed a proposal that contemplated replacing Hangar 24 with an FBO facility that would "provide service, maintenance, fueling, and shelter for general aviation aircraft." Although the putative developer later withdrew, Massport clung to the concept and proceeded with preparations for the redevelopment of the Hangar 24 site as an FBO facility — a facility compatible with the needs of modern-day corporate aircraft.

Massport's proposed course of action not only required it to jump through a long line of statutory and regulatory hoops but also drew considerable opposition from concerned citizens and groups. The ensuing battle was waged on a variety of fronts. In July of 2006, a nonprofit organization, Save Our Heritage, Inc. (a petitioner here), requested that the Massachusetts Historical Commission (the Commission), see Mass. Gen. Laws ch. 9, §§ 26-27, evaluate Hangar 24 for possible inclusion on the National Register of Historic Places (the National Register). After mulling the

matter, the Commission determined that Hangar 24 was eligible for listing only under Criterion A (association with significant historical events) and Criterion B (association with the lives of historically significant persons). See 36 C.F.R. § 60.4(a), (b). In light of this determination, the Commission asked Massport to study the hangar's condition and to consider alternative uses, including possible rehabilitation for occupancy by the Massachusetts Air and Space Museum. This suggestion proved to be a dead end; after conducting a site inspection, the museum reported that Hangar 24 fell "far short of what would be necessary to make the museum a viable entity."

Around the same time, Massport hired an aviation consultant, HNTB Corporation, to prepare a condition assessment and feasibility study for Hangar 24. HNTB documented and described the hangar's condition, and found it "functionally obsolete" and unsuitable for aviation use. Its report listed several alternatives for redeveloping the site.

Federal law requires that, in order to remain eligible for funding, an airport must maintain a current layout plan approved by the FAA. 49 U.S.C. § 47107(a)(16)(B). In evaluating a layout plan, "[t]he FAA's primary mission is to ensure the safety, security, and efficiency of the National Airspace System." Exec. Order No. 13,180, 65 Fed. Reg. 77,493, 77,493 (Dec. 11, 2000), as amended by Exec. Order No. 13,264, 67 Fed. Reg. 39,243

(June 7, 2002); see also 49 U.S.C. § 47101(a).  No facility that adversely affects the safety, utility, or efficiency of the airport can be included in such a plan.  49 U.S.C. § 47107(a)(16)(C).

The FAA became involved with the Hangar 24 project to fulfill these responsibilities.  It engaged in a consultation process and prepared an environmental assessment (EA) effective as of June 18, 2010.  The EA addressed the potential environmental impacts of Massport's redevelopment proposal, as well as its effects on historic properties.

In due course, the FAA approved the demolition and replacement of Hangar 24 as the only feasible and prudent alternative, found that replacing it would have no adverse effect within the meaning of the NHPA (save for the effect on Hangar 24 itself), and found no significant impact under the NEPA.  The petitioners filed a timely petition for judicial review, see 49 U.S.C. § 46110, in which they challenge the FAA's actions as noncompliant with the Transportation Act, the NHPA, and the NEPA. It is to these challenges that we now turn.

## II.  ANALYSIS

Our standard of review is familiar.  We must uphold the FAA's findings of fact as long as they are supported by substantial evidence.  See id. § 46110(c).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Penobscot Air Servs., Ltd. v. FAA, 164

F.3d 713, 718 (1st Cir. 1999) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)); see Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 377 (1998) (explaining that "substantial evidence" standard "gives the agency the benefit of the doubt").

We review an agency's compliance with section 4(f) of the Transportation Act in accordance with the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, 701-706. See Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Under the APA, we may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The same metric governs judicial review of agency action under both the NHPA, see Neigh. Ass'n of the Back Bay, Inc. v. Fed. Transit Admin., 463 F.3d 50, 58 (1st Cir. 2006), and the NEPA, Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 763 (2004). Agency action fails under this standard "if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." Assoc'd Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).

## A. **Transportation Act**.

As a functional matter, section 4(f) of the Transportation Act, which refers explicitly to the Secretary of Transportation, authorizes federal agencies dealing with transportation matters to approve projects that entail the use of historically significant sites. 49 U.S.C. § 303(c). But this authority is not unbridled. Approval may be granted in a particular case only if two preconditions are met: "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm." Id. These preconditions apply both when a proposal involves the physical use or occupation of a protected property thought to be historic and when a proposal involves indirect (but meaningful) effects on historic venues. Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 58 (1st Cir. 2001).

The EA prepared in connection with Massport's proposal to demolish Hangar 24 explicitly considered four alternative courses of action: 1) "[d]o nothing"; 2) "[l]ocate a new hangar facility elsewhere on the airport"; 3) "[a]daptive reuse of Hangar 24"; and 4) "[r]eplace Hangar 24 as proposed by Massport." The EA concluded that all of these alternatives were feasible, but that only the fourth was prudent. The petitioners dispute the FAA's determination of what alternatives are or are not prudent. As a fallback, they question whether the FAA has engaged in sufficiently

-9-

thorough planning to minimize harm to historic sites.  We appraise these challenges sequentially.

1.  **Prudence**.  The doctrinal linchpin of the petitioners' section 4(f) argument is their reading of the Supreme Court's decision in Overton Park.  In their view, Overton Park holds that, for the purpose of section 4(f), an alternative cannot be ruled out as imprudent absent a strong showing of aposematic conditions, manifested by "truly unusual factors," "extraordinary" costs and community disruption, or "unique problems."  401 U.S. at 413.  The FAA's section 4(f) analysis, the petitioners say, does not measure up to this benchmark.

Like alchemists who would turn dross into gold, the petitioners cherry-pick isolated phrases from the Overton Park opinion and attempt to convert those phrases into a broad, inflexible holding.  This wordplay will not wash.  The Court's mention of "truly unusual," "extraordinary," and "unique" circumstances was intended as a gloss on the application of section 4(f) in a particular type of situation.  Those descriptive terms were never meant to displace the statutory directive that the agency determine whether an alternative is "prudent."  See Eagle Found., Inc. v. Dole, 813 F.2d 798, 804-05 (7th Cir. 1987); see also Hickory Neigh. Def. League v. Skinner, 910 F.2d 159, 163 (4th Cir. 1990) (explaining that a section 4(f) evaluation need not

-10-

explicitly find "unique problems" when record confirms "compelling reasons for rejecting the proposed alternatives as not prudent").

Context drives this point home. Overton Park involved a proposal to use publicly owned parklands for highway construction. 401 U.S. at 406. The Court reasoned that the cost of using public land will almost always be less than that of acquiring private property for alternate routes and that, in addition, building on public parkland will almost always prove less disruptive to the acquiring community because homes and businesses will not be displaced. Id. at 411-12. These verities "are common to substantially all highway construction." Id. at 412 (emphasis supplied). If Congress had intended cost and community disruption "to be on an equal footing with preservation of parkland," the Court declared, section 4(f) would have been unnecessary. Id.

The explanation given by the Justices in Overton Park is situation-specific, and comparing this case to Overton Park is like comparing a plum to a pomegranate. The Overton Park language is tailored to fit situations in which, from a practical standpoint, there otherwise would be a perverse incentive in favor of using protected land for federal transportation projects. Cf. City of Dania Beach v. FAA, 628 F.3d 581, 587 (D.C. Cir. 2010) (noting that Overton Park analysis was premised on public/private cost and disruption disparities and that it is this "automatic advantage" that calls for "exceptional agency push-back").

-11-

Here, however, no such perverse incentive exists. All of the feasible alternatives involve land that is already part of Hanscom (i.e., land that is already government-owned). There is no built-in impediment to preservation. It would, therefore, make no sense to wrest the quoted Overton Park language from its contextual moorings and superimpose it upon the statutory imperative. It is the statute that ultimately controls our inquiry. See Eagle Found., 813 F.2d at 804-05 (examining Overton Park against backdrop of section 4(f)'s language and concluding that an agency's "reasons for using the protected land have to be good ones, pressing ones, well thought out").[1]

Let us be perfectly clear. Without question, section 4(f) imposes significant obligations upon a reviewing agency. See Save Our Heritage, 269 F.3d at 58. But the petitioners' attempt to festoon those obligations with magic words, selectively culled from the Overton Park opinion, distorts the statute and overreads the Court's teachings. As a general matter, the agency's obligations are what the statute says they are. Thus, our focus must be on the statute and its application to the facts at hand. See Hickory, 910 F.2d at 162-63.

---

[1] At the expense of adding hues to a rainbow, we note that, in compiling the EA, the FAA specifically stated that its prudence inquiry centered on "extraordinary safety or operational problems" (emphasis supplied). It seems to us that this reference indicates that the agency proceeded in the spirit of Overton Park, albeit adapting its inquiry to the vastly different circumstances before it.

This brings us to the substance of the petitioners' section 4(f) challenge. The starting point is the FAA's determination that none of the three explored alternatives to the Massport proposal would be prudent. In the pages that follow, we examine the three rejected alternatives one by one.[2]

### a. Do Nothing.

The petitioners complain about the FAA's analysis of the "do nothing" alternative. The agency rejected this alternative because "it would not meet Massport's purpose to provide an additional location on the airport to service, maintain, fuel, and shelter general aviation aircraft."

"It is well settled that an alternative is not prudent if it does not meet the transportation needs of a project." Back Bay, 463 F.3d at 65. The petitioners try to circumnavigate this principle on the ground that Massport never established any "need" for the Hangar 24 project. This evasion is easily thwarted.

---

[2] The petitioners protest that the FAA incorrectly disregarded a fourth alternative: the possibility of locating the new FBO facility at Worcester. But this suggestion surfaced for the first time during the comment period, and the FAA persuasively responded that, due to the approximately 50-mile distance between Hanscom and Worcester, the idea was "not practical." This makes eminently good sense for two reasons. First, the articulated need for a third FBO facility was based on data evidencing increased corporate jet use at Hanscom specifically, not in the region generally. Second, the record indicates that improvements to infrastructure are not usually in themselves sufficient to attract new activity to a particular airport. Air travel is, after all, tied clearly to location.

There are two existing FBO facilities at Hanscom. Perscrutation of the record reveals appreciable support for the proposition that a third FBO facility is needed. For example, Massport's 2005 draft environmental status and planning report (ESPR), heavily relied on in the EA, supplies data indicating that, even though the total volume of operations at Hanscom decreased between 1990 and 2005, corporate aviation grew at a rate of 4.4 percent per year.[3] Indeed, corporate aviation was "the only segment of general aviation that [was] growing at Hanscom" during that span. The ESPR projected that this pattern of growth would continue through 2010 and beyond. The ESPR described the methodology underlying its projections, and Massport compared the projections for 2005 with actual data for that year. The trend was evident: corporate aviation was experiencing continued growth at Hanscom, "which would increase the demand for [general aviation] hangars and associated facilities."

The ESPR also provided background information linking this trend to the need for a new FBO facility. Among other things, it related that "the majority of FBO activity involves servicing corporate general aviation activity," creating a link from its corporate aviation growth predictions to the need for a third FBO

---

[3] An agency is free to rely in part on relevant, previously conducted studies when preparing an EA. See Save Our Heritage, 269 F.3d at 59; Conservation Law Found. v. Fed. Hwy. Admin., 24 F.3d 1465, 1473 n.1 (1st Cir. 1994).

facility. The FAA built on this information, noting in the EA that "FBO capacity is not monolithic" and that "FBOs most frequently try to differentiate their services from those of their competitors" by, say, specializing in servicing a particular type of aircraft. The FAA's explanation that the apron and hangar facilities at the two existing FBO sites "have inadequate storage capacity for larger . . . aircraft" illustrates the pertinence of this conclusion.

In an effort to blunt the force of these data points, the petitioners insist that general aviation operations at Hanscom are in decline. This statistic misses the mark: the proposed FBO facility is not tethered to an anticipated increase in general aviation activity as a whole but, rather, to an anticipated increase in the narrower subset of corporate jet operations. Such an anticipated increase is adequately documented.

To say more on this point would be supererogatory. Given the substantial evidence of a need for the Hangar 24 project, we conclude that the FAA's rejection of the "do nothing" alternative as imprudent was neither arbitrary nor capricious. After all, doing nothing would fail to provide additional FBO services at Hanscom (and, thus, would fail to meet a demonstrated need).

### b. **The East Ramp**.

In its alternatives analysis, the FAA rejected the possibility of locating a new FBO facility elsewhere at Hanscom. A major drawback of this alternative is that "Hanscom Field is

approaching build-out," leaving only the East Ramp and Hangar 24 as available sites for general aviation improvements. As between these two options, the FAA determined that locating the new FBO facility on the East Ramp "would not be the most efficient use of space" because of the ramp's distance from the terminal area and the other two FBO facilities. Furthermore, "using the East Ramp for the FBO function . . . would preclude this area from being developed for general aviation aircraft hangars that are already located in this area of the airport."

The FAA had other worries. The agency found the East Ramp alternative plagued by access problems, because it could not be reached without passing through a secure military facility. Massport was wary of this potential problem and investigated various road reconfiguration layouts that might help to alleviate it. None of those routes provided an obvious solution; each would require an easement of some sort, and many would pass over natural features such as rivers and wetlands, creating potential environmental issues. What is more, the EA expresses a concern that potential developers would be less enthusiastic about constructing an FBO facility in such a remote area of the airport, possibly preventing the completion of the project.

Based on this collocation of factors, the FAA concluded that it would be more prudent to build the new FBO facility at Hangar 24 and use the East Ramp for general aviation aircraft

hangars.  This was a judgment call — and one that fell within the purview of the FAA's expertise.  The FAA's determination as to whether a given alternative is prudent must be informed by the statutory dictates that "the safe operation of the airport and airway system is the highest aviation priority" and that "airport construction and improvement projects that increase the capacity of facilities to accommodate passenger and cargo traffic be undertaken to the maximum feasible extent so that safety and efficiency increase and delays decrease."  49 U.S.C. § 47101(a)(1), (7); see City of Bridgeton v. FAA, 212 F.3d 448, 462 (8th Cir. 2000) (expressing "doubt whether [section 4(f)] mandates a rigid least-harm standard in airport expansion cases," because such an approach would be at odds with the "congressional mandate" prioritizing safety and efficiency in airport operations); see also Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 196 (D.C. Cir. 1991).

The petitioners concede that there is no site at Hanscom, other than the East Ramp, that might be a viable alternative to the Hangar 24 site.  But they claim that the FAA's evaluation of the East Ramp alternative fails adequately to quantify the supposed inefficiencies, lacks specifics regarding the terminal distance differential, and includes insufficient documentation of the access problem.  In support, they cite Stop H-3 Ass'n v. Dole, 740 F.2d 1442 (9th Cir. 1984), a case purportedly standing for the

-17-

proposition that such a level of detail is required before a feasible alternative may be discarded as imprudent.

The record refutes this claim. The FAA did not rely on taxi distance or access impediments alone to justify its decision but, rather, cited the combined effect of a number of considerations which weighed heavily against the East Ramp as a safe and efficient FBO site. An agency legitimately may invoke an accumulation of factors to rule out an alternative as imprudent. See Comm. to Pres. Boomer Lake Park v. Dep't of Transp., 4 F.3d 1543, 1550 (10th Cir. 1993); see also Eagle Found., 813 F.2d at 805 ("A prudent judgment by an agency is one that takes into account everything important that matters. A cumulation of small problems may add up to a sufficient reason to use § 4(f) lands."). Even the Stop H-3 court acknowledged the salience of this principle. See 740 F.2d at 1455.

In the last analysis, "it is up to those who assail [the agency's] findings or reasoning to identify the defects in evidence and the faults in reasoning." Save Our Heritage, 269 F.3d at 60. The petitioners have not carried this burden. Although they decry the FAA's appraisal of the East Ramp alternative, the FAA has presented a compelling articulation of the factors that contributed to its decision. The petitioners have not offered the "sustained and organized rebuttal," id., that would be necessary to invalidate this articulation.

-18-

### c. **Adaptive Reuse**.

We come now to the FAA's evaluation of the third alternative: the possibility of adapting Hangar 24 to accommodate the FBO project. The FAA explained that "this alternative has significant disadvantages because of the hangar's poor condition, relatively small size, and functional inadequacy." The size of both the building and the doorway aperture would have to be increased dramatically in order to outfit the hangar for use by larger aircraft.

Enumerating these and other considerations, the EA concluded that adaptive reuse "is expected to require substantial and impractical building modifications to allow the building to function for its intended use and bring the building into compliance with current environmental, structural, fire, safety, and energy codes." This conclusion was reinforced by the HNTB study, which reported that any reconfigured version of Hangar 24 "would be inefficient to use and maintain . . . and unusable as a hangar." The study also noted that refurbishing Hangar 24, which "may or may not be structurally feasible," would cost some $500,000 more than the estimated cost of constructing a brand new facility.

In rebuttal, the petitioners assert that there is no data showing that Hangar 24 would require enlargement. This assertion is at best a half-truth; it is premised on the hypothesis that there is no demonstrated demand for facilities that can accommodate

-19-

larger aircraft. This hypothesis is a slight variation on a previously rejected theme, see supra Part II(A)(1)(a), but the variation is immaterial. As we have explained, the record contains substantial support for the assertion that demand for FBO services at Hanscom is likely to continue to increase. The record likewise reveals that the two existing FBO facilities cannot readily accommodate larger aircraft, and it further notes that the existing Hangar 24 structure is too small to be compatible with G5 business jets. This information is sufficient to undergird the FAA's conclusion that enlargement of Hangar 24 would be required in any sensible reuse scenario.

As evidence of the viability of adaptive reuse, the petitioners seize upon a suggestion that it might be feasible to raise the roof of Hangar 24 without demolishing the building. In support, they note that the roof had been raised once before and that the agency did not respond to this possibility (which first surfaced during the comment period). An agency is under no obligation to respond individually to each and every concern raised during the comment period. See Conservation Law Found. of New Engl., Inc. v. Andrus, 623 F.2d 712, 717 (1st Cir. 1979). Here, moreover, the comment was not so compelling as to demand a direct response given the building's overall condition and structural deficiencies. See 40 C.F.R. § 1508.9(a) (describing EA as "a concise public document" (emphasis supplied)).

-20-

The petitioners' critique of the FAA's adaptive reuse analysis gains no traction from a claimed inconsistency between the FAA's conclusion that Hangar 24's door height would have to be increased and Massport's commitment to maintaining an unobtrusive building profile when redeveloping the site. There is simply no reason to believe that a door-height increase would necessarily result in a building incompatible with surrounding structures. In the absence of concrete evidence to that effect, such conjecture is insufficient to undermine the FAA's finding regarding the imprudence of adaptive reuse. See Save Our Heritage, 269 F.3d at 60 ("Gauzy generalizations and pin-prick criticisms, in the face of specific findings and a plausible result, are not even a start at a serious assault.").

We add that even if none of the factors cited by the FAA, standing alone, would justify its finding that adaptive reuse is imprudent, that finding would still be supported by the totality of the factors. In making judgment calls of this sort, an agency is both entitled and obliged to consider the totality of the circumstances. See, e.g., Eagle Found., 813 F.2d at 805. The whole is sometimes greater than the sum of the parts, and the considerations limned in the EA, taken together, provide a reasoned basis, adequately anchored in the administrative record, upon which the FAA could conclude — as it did — that adaptive reuse is not a prudent alternative.

There is one loose end. As discussed in the EA and as considered during the consultation period, the reuse alternative encompassed a proposal that Hangar 24 be converted into an aviation museum. The FAA discussed this option "because of the significant interest expressed on the part of consulting parties and the public." Though the proposal was sufficiently broad to include a number of potential museum developers, one of the most likely candidates — the Massachusetts Air and Space Museum — had already declared the site unsuitable. Ultimately, the agency rejected the museum possibility because such a use would not address perceived transportation needs and would present significant security concerns that made it "undesirable and impractical." We find no error in this determination. See 49 U.S.C. § 47101(a)(1) ("[T]he safe operation of the airport and airway system is the highest aviation priority . . . ."); see also Back Bay, 463 F.3d at 65.

That ends this aspect of the inquiry. In this context, prudence is largely a matter of safety and efficiency; and the FAA's determination that none of the three alternatives would be prudent was, on the record before it, well within the universe of reasonable outcomes. When that is true, it is not the place of a reviewing court to second-guess the agency.

**2. Minimization of Harm.** Once an agency determines that there is no feasible and prudent alternative to the use of protected land, section 4(f) requires it to consider whether the

proposal at hand "includes all possible planning to minimize harm." 49 U.S.C. § 303(c)(2). An agency determination that a submitted plan sufficiently minimizes the likely harms to historic properties must be treated respectfully by a reviewing court. Such determinations "deserve even greater deference than agency determinations concerning practicable alternatives." Conservation Law Found. v. Fed. Hwy. Admin., 24 F.3d 1465, 1476-77 (1st Cir. 1994); see Concerned Citizens Alliance, Inc. v. Slater, 176 F.3d 686, 702 (3d Cir. 1999).

The petitioners insist that the FAA should postpone the demolition of Hangar 24 until after the design, permitting, and financing of the new FBO facility are in place, thus leaving open the possibility that the facility might incorporate the existing hangar. We reject these importunings. When discussing minimization, the FAA specifically noted that "reuse of Hangar 24 as a hangar is neither prudent nor practical." The FAA fully addressed the adaptive reuse approach in its analysis and supportably determined that this approach was imprudent. No more was exigible. An agency need only consider harm-minimizing steps that are feasible and prudent under existing circumstances. Back Bay, 463 F.3d at 66. A few explanatory comments may be helpful.

Section 4(f)(2)'s requirement that a project include planning to minimize harm to historic sites does not demand that an agency, having already ruled out an option as imprudent under

-23-

section 4(f)(1), circle back to reconsider that option as a means of mitigating harms. Instead, the 4(f)(2) inquiry is focused on means of minimization that are compatible with the alternative or alternatives deemed feasible and prudent under 4(f)(1).

Congress established a very rigorous, time-consuming administrative process through which projects that might affect protected historic sites are reviewed and, if appropriate, approved. This administrative process is geared toward consideration of the project concept itself, regardless of which developer may ultimately carry the proposal to fruition. Of course, should the parameters of the project change materially, additional administrative approvals will likely be necessary. But so long as the project's scope remains within the general contours of the proposal reviewed and approved by the agency, the validity of its approval is not conditioned on the presence or absence of a developer prepared to move forward with the construction.

## B. NHPA.

Section 106 of the NHPA requires that federal agencies "take into account the effect of [an] undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f. It also directs that agencies "shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment." Id. In fine, "[s]ection 106 is a procedural statute

-24-

that requires agency decisionmakers to 'stop, look, and listen,' but not to reach particular outcomes." Back Bay, 463 F.3d at 60 (quoting Narragansett Indian Tribe v. Warwick Sewer Auth., 334 F.3d 161, 166 (1st Cir. 2003)).

Congress created the Advisory Council on Historic Preservation (the Council) to administer the NHPA. See 16 U.S.C. §§ 470i, 470s. The Council has promulgated regulations to guide agencies in performing their obligations under the statute. See 36 C.F.R. pt. 800. These regulations direct agencies to determine if a project qualifies as an "undertaking" that "has the potential to cause effects on historic properties." Id. § 800.3(a). If so, the agency must consult with the state historic preservation officer (SHPO) to "[d]etermine and document the area of potential effects." Id. § 800.4(a)(1); see id. § 800.16(d). The agency, along with the SHPO, is then directed to "apply the National Register criteria" to arguably eligible sites within the area of potential effects. Id. § 800.4(c)(1). If the agency finds that historic sites may be affected, it must solicit the views of various parties. Id. § 800.4(d)(2). The agency then applies the criteria delineated in the regulations to determine if there is an effect or effects, id. § 800.5(a), and if so, engages in further consultation to resolve any such effects, id. § 800.5(d)(2).

This step involves notifying the Council so that it can decide whether its continued participation is desirable, id.

-25-

§ 800.6(a)(1), and looking at alternatives that might "avoid, minimize or mitigate the adverse effects," id. § 800.6(b)(1)(i), (b)(2). If the agency and the consulting parties agree on a means of abating the effects, they must execute a memorandum of agreement (the Memorandum). Id. § 800.6(b)(1)(iv), (b)(2). The Memorandum "evidences . . . compliance with section 106" and the regulations. Id. § 800.6(c).

In the case at hand, NHPA consultation began in April of 2008, when the FAA informed the Commission (the relevant state entity) that the Hangar 24 project was an "undertaking" within the purview of the regulations. The FAA concurred with the Commission's finding that the hangar was eligible for listing on the National Register under Criteria A and B. The FAA and the Commission then defined the project's area of potential effects to include the footprint of the hangar and its appurtenances.

In December of 2008, the FAA issued a draft EA, which was made available for public comment. The Council reviewed this document and determined that its "participation in the consultation to resolve adverse effects [was] unnecessary." According to the Council, the EA's discussion of alternatives was "exhaustive," and the Commission fully concurred with the FAA's findings about the project's effects (and lack of effects) on historic properties. The FAA proceeded to prepare a draft Memorandum to memorialize its commitments to mitigation and circulated the Memorandum to the

consulting parties for their input.  The final EA responded to comments and included a final version of the Memorandum.

The petitioners advance a salmagundi of arguments as to why the NHPA requirements were not satisfied.  To begin, they argue that, because the area of potential effects was determined "without reference to any specific development proposal," that determination is inconsistent with the regulatory directive that the area's scope should be "influenced by the scale and nature of an undertaking." Id. § 800.16(d).  It is true that when the EA was prepared, there was no developer lined up to proceed with FBO facility construction and, thus, no definitive set of development plans existed.  But Massport had previously reviewed proposals and selected a plan for the site, thus evincing that it had a particular set of criteria in mind.  The concept was clearly delineated.

NHPA's implementing regulations direct agencies to "ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered." Id. § 800.1(c).  This directive makes it pellucid that agencies are not expected to delay NHPA review until all details of the proposal are set in cement.  Of course, should the project's scope change in some material way when a specific developer is identified, additional FAA approvals may be required. But the proposal here was sufficiently well-defined to trigger the NHPA review process.

Taking a different tack, the petitioners say that the FAA erred in determining that the area of potential effects did not encompass any historic sites beyond Hangar 24 itself. This is whistling past the graveyard; the record reveals beyond hope of contradiction that the FAA examined the possibility of effects on other sites and supportedly concluded that none of the alternatives would have an effect — either direct or indirect — on any protected historic venue (apart from Hangar 24 itself).

Relatedly, the petitioners fault the FAA for neglecting to take into account, when defining the area of potential effects, the possibility that the project would alter views from nearby sites and, in the bargain, create a fire hazard attributable to fuel storage. But the 2005 ESPR noted that, due to local topographical features, the airport was not visible from most nearby locations; and in any event, Massport committed to maintaining building dimensions that would "be respectful of views from off-site vantages." Finally, in its response to public comments appended to the EA, the FAA explained that the State Fire Marshal's Office will regulate fuel storage at any new structure and that other measures for the containment of fuel-related hazards had been contemplated. Regardless of whether the petitioners agree with the FAA's conclusions about these matters, they have failed to show that the conclusions are arbitrary or capricious.

The petitioners' next plaint is equally without foundation. Although they express concern that the new FBO facility would indirectly affect noise levels by attracting additional jet traffic, the FAA explained in the EA why that scenario is unlikely to occur. There, it stated that, consistent with its mandate to provide "a safe and efficient national airspace system," the FBO project was intended "to meet forecasted demand for adequate facilities" for corporate aircraft at Hanscom. This articulated purpose was aimed at meeting an increase in demand that the record confirms will likely take place independent of any improvements at Hanscom; it was not calculated to drive an increase in traffic.

In light of the FAA's observation that improvements to infrastructure are not typically sufficient, on their own, to attract new activity to an airport, the record is barren of any basis for the expectation that the new FBO facility will cause any increase in traffic. In the absence of such an evidentiary predicate, it was entirely logical for the FAA to conclude that the contemplated FBO facility would produce no meaningful increase in noise levels. Cf. Save Our Heritage, 269 F.3d at 62-63 (upholding FAA finding that impacts of newly authorized flights were de minimis under NHPA and NEPA standards).

If more were needed — and we doubt that it is — we note that, notwithstanding its determination that the potential for

increased noise was not a problem, the FAA went the extra mile; it made a "worst case" calculation. While the agency was under no obligation to make a worst case calculation in light of its no-effects finding, cf. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 356 (1989) (explaining that NEPA analysis should "focus on reasonably foreseeable impacts" and that no "worst case analysis" is required), the results of that calculation reinforced its position.

Switching gears, the petitioners urge that because Walden Pond (a national historic landmark) is nearby, the FAA was required to comply with the heightened standards that pertain to such sites. See 16 U.S.C. § 470h-2(f); 36 C.F.R. § 800.10. Given the FAA's warranted determination that there would be no effects on nearby historic sites, the agency was under no obligation to move to this more intensive level of review. See Back Bay, 463 F.3d at 64.

The petitioners have one last grievance addressed to the FAA's NHPA compliance. They argue that the FAA and the Commission blundered in finding that Hangar 24 was ineligible for listing on the National Register under Criterion C, which applies to sites that embody distinctive architectural characteristics. See 36 C.F.R. § 60.4(c). This grievance is baseless.

To be sure, the criteria used to determine whether a site qualifies for listing on the National Register will inform the choice of appropriate mitigation measures. Here, however, there is

ample evidence in the record to show that the FAA and the Commission fully considered the applicability vel non of Criterion C. To this end, the Commission observed, in correspondence to the FAA, that Hangar 24 was "deteriorated" and had been "cleared of its historical scientific instrumentation, equipment, research files, and furnishings." In a return letter, the FAA confirmed its awareness of "new information" pertinent to Criterion C proffered by the Concord Historical Commission and found that this proffer contained no insights beyond those previously considered.

The short of it is that the petitioners, despite their kaleidoscopic array of attacks, have not shown noncompliance with any of the procedures mandated by the NHPA and its implementing regulations. Nor have they shown that the FAA failed to satisfy its obligation to weigh effects. While the petitioners may disagree with the FAA's calibration of these scales, that disagreement, in itself, is insufficient to scuttle the FAA's findings.

## C. **NEPA**.

The NEPA requires federal agencies to prepare an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Where the need for an EIS is not obvious, an agency may instead prepare an EA. 40 C.F.R. § 1501.4(b). An EA is meant to be less detailed than an EIS. See, e.g., United States v.

-31-

<u>Coal. for Buzzards Bay</u>, ___ F.3d ___, ___ (1st Cir. 2011) [No. 10-1664, slip op. at 11]. If the agency, based on the EA, determines that an EIS is not needed, it may issue an explained finding of no significant impact. 40 C.F.R. § 1501.4(c), (e). The requirements imposed by the NEPA are procedural in nature and are not intended to dictate any particular substantive outcome. <u>Pub. Citizen</u>, 541 U.S. at 756; <u>Robertson</u>, 490 U.S. at 350.

The petitioners' NEPA challenge focuses on the FAA's consideration of the potential to increase noise levels. Specifically, the petitioners upbraid the FAA for failing properly to quantify cumulative noise impacts. The applicable regulations define cumulative effects as "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

This lament does not withstand scrutiny. The record shows that the FAA considered all the relevant factors. It identified the only other reasonably foreseeable development (that anticipated for the East Ramp) and added anticipated noise from that project, calculated at 0.3 dB, to a predicted maximum noise increase of 0.2 dB from the Hangar 24 project. The 2008 East Ramp noise study upon which the FAA based its worst case calculation took account of total noise levels in the area. It added the projected increase for the East Ramp development to preexisting baseline noise conditions. See <u>League of Wilderness Defenders</u> v.

-32-

U.S. Forest Serv., 549 F.3d 1211, 1217 (9th Cir. 2008).  The FAA generally regards as significant a decibel increase of 1.5 dB or greater (based on a day-night average) at or above a 65 dB noise exposure level.  FAA Order 1050.1E, CHG 1, App. A, para. 14.3 (Mar. 20, 2006).  The foreseeable increase here fell comfortably within that range.  We conclude, therefore, that the FAA's exercise constituted a reasonable approach to the potential problem.  And as a further check, the FAA "carefully reviewed" the 2005 ESPR's analysis of the projected cumulative noise and air quality effects of both the Hangar 24 and the East Ramp projects.[4]

The petitioners calumnize the FAA's decision to extrapolate from prior studies rather than commission a new study for Hangar 24.  In our view this decision was not unreasonable, especially given the agency's prediction, based on the FAA's experience with other airport projects, that the Hangar 24 project was unlikely to have any impact at all on noise levels.  We hold,

---

[4] The petitioners point out that the FAA's own internal guidance acknowledges that the "65 dB threshold does not adequately address the effects of noise on visitors to areas within a national park . . . where other noise is very low and a quiet setting is a generally recognized purpose and attribute."  FAA Order 1050.1E, CHG 1, App. A, para. 14.3.  This guidance does not help the petitioners.  Although Hanscom is located in close proximity to at least one historic national park, the petitioners have proffered no evidence that any such park is specifically recognized for its tranquility.  See, e.g., 16 U.S.C. § 410s(a) (establishing Minute Man National Historical Park and describing its purposes).  For that matter, the petitioners have proffered no evidence showing a need for special noise level protection at any place in the vicinity.

therefore, that the FAA's noise impact calculations are impervious to the petitioners' challenge.

Of course, if and when Massport chooses to proceed with additional development at Hanscom, that work may require additional FAA approvals. But the NEPA requires a cumulative analysis only "to ensure that a project is assessed as a whole and not sliced into 'small component parts.'" Town of Marshfield v. FAA, 552 F.3d 1, 4 (1st Cir. 2008) (quoting 40 C.F.R. § 1508.27(b)(7)). For NEPA purposes, an agency need not speculate about the possible effects of future actions that may or may not ensue. See, e.g., Coal. on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 69 (D.C. Cir. 1987).

## III. CONCLUSION

We need go no further. A careful reading of the administrative record shows with conspicuous clarity that the FAA was cognizant of, and complied with, its responsibilities under the applicable statutes and regulations. The conclusions that it reached, though not inevitable, are adequately grounded and in accordance with law. Accordingly, we deny the petition for judicial review.

**So Ordered**.