[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15791
_____

D.C. Docket No. 2:14-cv-14192-DMM

CONSERVATION ALLIANCE OF ST LUCIE COUNTY, INC.,
a Florida Not-For-Profit Corporation,
TREASURE COAST ENVIRONMENTAL DEFENSE FUND,
a.k.a. Indian Riverkeeper,

                                            Plaintiffs - Appellants,

versus

U.S. DEPARTMENT OF TRANSPORTATION,
SECRETARY, U.S. DEPARTMENT OF TRANSPORTATION,
FEDERAL HIGHWAY ADMINISTRATION,
VICTOR MENDEZ,
Administrator of the Federal Highway Administration,
JAMES CHRISTIAN,
Division Administrator of the Florida Division
of the Federal Highway Administration,

                                            Defendants - Appellees,

CITY OF PORT ST. LUCIE,

                                            Intervenor Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(February 3, 2017)

Before MARCUS, DUBINA, and WALKER,[*] Circuit Judges.

MARCUS, Circuit Judge:

When the City of Port St. Lucie sought to build a new bridge spanning the North Fork St. Lucie River (NFSLR), it was required to work with the Federal Highway Administration (FHWA) and the Florida Department of Transportation (FDOT) to choose an acceptable location for that bridge. The selection process was complicated by the fact that each of the proposed paths for the new bridge impacted "publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge" that is protected under § 4(f) of the Department of Transportation Act. 49 U.S.C. § 303(c). Under § 4(f), the Secretary of Transportation may approve projects that use § 4(f) lands only if the agency first determines that there is no feasible and prudent alternative to using that land. Id. at § 303(c)(1). If there are no such alternatives, the agency must conduct "all possible planning" to minimize harm to the protected lands. Id. at § 303(c)(2).

_____

[*] Honorable John Walker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

2

The Federal Highway Administration and the City worked in concert with many federal, state, and local agencies to conduct a lengthy analysis of the sociocultural, economic, and environmental impacts each alternative carried in its wake before making a selection. The agencies also collaborated on a mitigation plan to remedy the adverse effects of the preferred alternative. Ultimately, all of the agencies involved in the review agreed on a path for the new bridge that would use approximately two acres of § 4(f) land.

Plaintiff-appellants Conservation Alliance of St. Lucie County, Inc., and Treasure Coast Environmental Defense Fund, Inc., are two environmental organizations that challenge the FHWA's selected alternative. They claim that the FHWA abused its discretion in not selecting their proffered alternative that, when built with a spliced-beam construction, would avoid all use of § 4(f) lands. After examining this alternative, the FHWA determined that spliced-beam construction would cause significantly greater harm to non–§ 4(f) wetland areas and, therefore, deemed the spliced-beam construction "imprudent." It also concluded that Appellants' favored path was imprudent because it would cause "severe social impacts." That path would require the construction of a new six-lane roadway running diagonally through an established residential neighborhood, which would result in residential and commercial relocations, would create substantial visual and noise impacts, would require the relocation of a retirement community's

3

access road, and would have the potential to affect neighborhoods with a higher than average number of minority households. Ultimately, the FHWA rejected Appellants' favored alternative as "imprudent." Appellants now claim that these determinations were arbitrary and capricious.

We recognize that § 4(f) sets a high bar that an agency must clear before it may approve a project that affects any § 4(f) lands. Here, however, the FHWA cleared that bar. "[S]evere and immitigable social impacts" associated with Appellants' preferred alternative would be sustained in order to avoid the use of barely two acres of parkland in parks with nearly 10,000 acres in total. What's more, the FHWA worked with federal, state, and local agencies to develop ambitious mitigation plans that include the addition of nearly 110 acres to the affected parks. The FHWA was thorough and careful in its analysis and thoughtful in its determination, and we can discern neither an arbitrary or capricious action nor an abuse of discretion. Accordingly, we affirm.

## I.

## A.

The City of Port St. Lucie, some one hundred and fifteen miles north of Miami, has grown rapidly in the past twenty-five years, nearly tripling in population from about 56,000 residents in 1990 to about 164,000 residents in 2010. The best predictions are that its population will exceed 225,000 by 2035.

4

Currently, only two bridges within the City cross the North Fork St. Lucie River: the bridge at Port St. Lucie Boulevard and the bridge at Prima Vista Boulevard. Those bridges link the communities on the east and west sides of the river and provide the only means of east-west emergency evacuation in case of a natural disaster like a hurricane for residents east of the NFSLR. The existing traffic crossing those two bridges now well exceeds the bridges' capacities.

Indeed, the City recognized the need for a third crossing of the NFSLR as early as 1980, and it was determined that merely widening the two existing bridges would not provide the necessary traffic relief. The general location for the new crossing was set between the two existing bridges, and in June 2008 the City conducted a study to identify an appropriate corridor for the bridge (the "Corridor Report"). After consulting advisory groups and the Federal Highway Administration, the City concluded that Corridor 5 (the "Crosstown Parkway Corridor") was "the only location for a crossing that met the purpose and need for the project."

After selecting the Crosstown Parkway Corridor for the project, the City conducted another report (the "Alternatives Report") that examined ten alternative sites within Corridor 5: a Multimodal Alternative (which involved influencing travel behaviors and incentives), a Transportation System Management Alternative (which involved operational and intersection improvements), and eight build

5

alternatives (which involved new crossings of the NFSLR).  Both the Corridor Report and the Alternatives Report were reviewed by the Environmental Technical Advisory Team, which for this project included the FHWA, the U.S. Army Corps of Engineers ("Army Corps"), the U.S. Environmental Protection Agency (EPA), the U.S. National Marine Fisheries Service (NMFS), the U.S. Fish and Wildlife Service (FWS), the U.S. Coast Guard (USCG), the South Florida Water Management District (SFWMD), the Florida Department of Environmental Protection (FDEP), the Florida Fish and Wildlife Conservation Commission (FWC), the Florida Department of Economic Opportunity, the Florida Department of State, the Miccosukee Tribe, the Natural Resources Conservation Service, and the St. Lucie Transportation Planning Organization (TPO).  The reports were also posted in the FDOT's online Environmental Screening Tool.  No comments were submitted on the reports, which were accepted by the FHWA on March 24, 2009. The City determined that the Multimodal Alternative, the Transportation System Management Alternative, and two of the eight build alternatives did not meet the project's purpose and need.  The FHWA reviewed the City's reports and concluded that, "due to the sensitive social and environmental character of the project area and to ensure a comprehensive comparison and evaluation of alternatives, the remaining six build alternatives would be carried forward as potential viable

6

alternatives for evaluation."  The six build alternatives are depicted below in

Figure 1.

## Figure 1.  Project Build Alternatives



FM No. 410844-1-28-01
FP No. 7777-087-A
ETDM No. 8247

Crosstown Parkway Extension PD&E Study and
Environmental Impact Statement
**Build Alternatives**
Figure 3.25

The FHWA, as the lead federal agency, then began preparing an Environmental Impact Statement (EIS), as it was required to do by the National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852 (1970), codified at 42 U.S.C. § 4321 et seq., and which was to be conducted by the City. In compiling the Draft EIS, the City considered obvious concerns, including social and economic impacts, physical-resource impacts, visual impacts, natural-resource impacts, and cumulative impacts associated with the alternatives. An analysis under § 4(f) of the Department of Transportation Act, Pub. L. No. 89-670, 80 Stat. 931, 934 (1966), codified as amended at 49 U.S.C. § 303(b)–(c), was also mandated, because three properties within the project area -- the North Fork St. Lucie River Aquatic Preserve (AP), the Savannas Preserve State Park (SPSP), and Kiwanis Park[1]-- are "park[s], recreation area[s], wildlife and waterfowl refuge[s], or historic site[s]" that are protected under § 4(f). 49 U.S.C. § 303(c). These analyses were compiled into a Draft EIS that the FHWA approved and made publicly available on July 1, 2011. The § 4(f) properties in relation to the build alternatives are depicted below in Figure 2.

---

[1] The AP includes 2,972 acres of surface water area along sixteen river miles of the river. Build alternatives that require piers in the AP thus use protected land, because the bases of the piers use land in the AP. The SPSP includes three separate parcels of land: the original SPSP located east of U.S. 1, the former NFSLR Buffer Preserve located west of U.S. 1, and the Miller Tract located west of Fort Pierce. Together, these areas total 7,186 acres. Kiwanis Park is a neighborhood park that is owned and maintained by the City. Neither the FHWA's preferred alternative nor Appellants' proffered alternative uses land in the Kiwanis Park.

9

Figure 2.  Section 4(f) Properties within the Project Area



As the project sponsor, the City was tasked with the responsibility of selecting a Locally Preferred Alternative (LPA).  On November 17, 2011, after a lengthy evaluation process, the City, the FDOT, and the TPO selected build Alternative 1C as the LPA.  On January 23, 2012, the Port St. Lucie City Council adopted Alternative 1C as the LPA.  On July 16, 2012, the FDOT wrote to the FHWA to formally request that it identify Alternative 1C as the preferred alternative, and on July 30, 2012, the FHWA concurred in the selection of Alternative 1C.

The FHWA then revised the Draft Environmental Impact Statement into a Final Environmental Impact Statement that was issued in June 2013 and was approved for public circulation on November 14, 2013.  The Final EIS was subsequently incorporated into the FHWA's final Record of Decision.  The Final EIS recounted the considerable efforts taken by the City and the FDOT to select an LPA and restated the analyses that had previously been reported in the Corridor Report, the Alternatives Report, and the Draft EIS.  It analyzed each build alternative carefully, and it also considered different methods of bridge construction.  While one method -- spliced-beam construction -- would have resulted in Appellants' favored Alternative 6A avoiding all use of § 4(f) land, the FHWA determined that spliced-beam construction was imprudent due to its substantially larger impact on non–§ 4(f) wetland habitats.

11

The FHWA concluded that each build alternative used some § 4(f) land and, therefore, that no feasible and prudent avoidance alternatives existed.  Notably, Appellants' favored Alternative 6A was not an avoidance alternative because it would use 0.01 acres of the Aquatic Preserve through the placement of piers in the riverbed.  It was also deemed imprudent due to its "severe social impacts." Although Alternative 6A would swing far to the north to avoid running through the Savannas Preserve State Park, its northerly route would require constructing a new six-lane roadway that would run diagonally through an established residential area where no road currently exists.  The FHWA concluded that the new road's negative impacts on community cohesion and local mobility were significant enough to render this alternative imprudent.

The Federal Highway Administration then considered various alternatives to determine which one resulted in the least overall harm.  Based on its own analyses and on the reports generated by the City, and after coordination with the public, stakeholders, and regulatory and cooperating agencies including the FDOT, the FDEP, and the TPO, the FHWA eliminated four of the six build alternatives, including Alternative 6A, "due to the magnitude of their impacts to non-Section 4(f) resources after reasonable mitigation."  The FHWA then concluded that, of the remaining two options, Alternative 1C was the option with the least overall harm to § 4(f) lands.  Although Alternative 1C would use 0.02 acres of the AP and 2.14

12

acres of the SPSP after mitigation, the FHWA concluded that it had "the least overall net harm" because "[i]t ha[d] fewer social impacts than any other build alternative, it ha[d] the least number of residential relocations, and it require[d] no business relocations."

Following the selection of the Preferred Alternative, additional avoidance and mitigation efforts were developed in coordination with the Army Corps, the EPA, the NMFS, the SFWMD, the FDEP, and the FWS. Together, the agencies developed a Proprietary Mitigation Plan that offered compensatory mitigation for obtaining an easement to cross state-owned lands and a Regulatory Mitigation Plan that focused on compensating for unavoidable impacts to natural resources.

These plans included general efforts to reduce the impact on § 4(f) lands, such as reducing the width of the typical bridge section from 143 feet to 103 feet, which decreased the use of the SPSP by 0.07 acres (to 2.14 acres). They also included remedial efforts, such as water-quality improvement projects, rehabilitation of riverbed land, and the addition of 108.55 acres of land to the SPSP. The plans also included substantial improvements to the Halpatiokee Canoe and Nature Trail, because Alternative 1C would block access to the head of the trail. The FHWA and the Florida Department of Environmental Protection agreed on a mitigation plan that would relocate the trail access point approximately 1,000 feet to the south of its present location. In addition, the plan included

13

improvements to and maintenance of the currently unimproved trails that pass through floodplain wetlands and are inundated or flooded for most of the year. The FDEP agreed that these plans would compensate fully for the impacts of Alternative 1C and indeed would provide substantial benefits to the SPSP by increasing the park by 108.55 acres. The FDEP also entered into a Memorandum of Understanding with the City stating that the City would provide the listed mitigation efforts in exchange for an easement to cross the North Fork St. Lucie River.

Alternative 1C was officially designated the "Preferred Alternative" in the FHWA's final Record of Decision that was signed on February 24, 2014. In that decision, the FHWA concluded that "unique or unusual factors are involved in the use of alternatives that avoid Section 4(f) properties, and the cost, social, economic, and environmental impacts, or community disruption resulting from such alternatives reach extraordinary magnitudes." There were no feasible and prudent alternatives to using land from the AP and the SPSP, and the Preferred Alternative -- Alternative 1C -- "ha[d] the least net harm to Section 4(f) resources." Final agency approval was thus given to Alternative 1C.

B.

Conservation Alliance of St. Lucie County ("Conservation Alliance") is a nonprofit corporation whose mission is "to protect the water, soil, air, native flora

14

and fauna upon which all the Earth's creatures depend on for survival." Many of its members regularly visit the Halpatiokee Trail to hike, sightsee, and take pictures. Treasure Coast Environmental Defense Fund, Inc., also known as the Indian Riverkeeper, is a nonprofit whose mission is "to protect and restore the waters of North America's most diverse estuary, the Indian River Lagoon, its tributaries, fisheries and habitats." Its members regularly use the AP, the SPSP, and the Halpatiokee Trail for recreational purposes.

On May 12, 2014, Conservation Alliance and Indian Riverkeeper (hereinafter collectively referred to as "Conservation Alliance") filed a complaint in the United States District Court for the Southern District of Florida against the United States Department of Transportation (DOT), DOT Secretary Anthony Foxx, the Federal Highway Administration, FHWA Administrator Victor Mendez, and FHWA Florida Division Administrator James Christian (hereinafter collectively referred to as the FHWA), seeking declaratory and injunctive relief. Specifically, Conservation Alliance alleged that the FHWA had arbitrarily and capriciously failed to identify Alternative 6A as a feasible and prudent alternative to Alternative 1C. It also claimed that, if constructed using a spliced-beam bridge construction, "Alternative 6A Spliced" would completely avoid the use of § 4(f) properties and thus should have been selected over Alternative 1C.

15

Conservation Alliance moved for summary judgment on March 16, 2015, and the FHWA cross-moved for summary judgment on May 12, 2015.  In the interim, the City of Port St. Lucie moved to intervene in the case; that motion was denied.  Instead, the City participated as an amicus curiae supporting the FHWA's motion for summary judgment.  A hearing on the motions for summary judgment was held on October 6, 2015, and on November 5, 2015, the district court granted the FHWA's motion and denied Conservation Alliance's motion.  The district court reasoned that the FHWA "acted within the scope of its authority and reasonably concluded that neither alternative 6A or 6A with a spliced beam construction method was a prudent alternative."  Further, the FHWA's "ultimate conclusion that Alternative 1C [would] cause the least overall harm [was] not arbitrary and capricious."  Because the court could "discern no clear error in judgment," final summary judgment was entered for the FHWA.

Conservation Alliance timely appealed.

## II.

"We review a grant of summary judgment de novo and apply the same legal standards as the district court."  Citizens for Smart Growth v. Sec'y of Dep't of Transp., 669 F.3d 1203, 1210 (11th Cir. 2012).  "When confronted with claims brought under the [Administrative Procedure Act], we may only set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in

16

accordance with law.'" Id. (quoting 5 U.S.C. § 706(2)(A)). "This standard is exceedingly deferential." Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008) (quotation and alteration omitted). In order to determine whether the agency's decision was arbitrary and capricious, we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); see also Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers, 833 F.3d 1274, 1285 (11th Cir. 2016) ("Our inquiry is limited by law to whether the agency's decision was based on a consideration of the relevant factors and, ultimately, whether it made a clear error of judgment."). This inquiry is "searching and careful, [but] the ultimate standard of review is a narrow one." Overton Park, 401 U.S. at 416.

In reviewing the FHWA's actions, our focus is "on the administrative record, not the district court's opinion." Citizens for Smart Growth, 669 F.3d at 1216. As a result, "we need accord no particular deference to the district court's conclusions," and "[w]hile the Secretary's decision is entitled to a presumption of regularity, that presumption does not 'shield his action from a thorough, probing, in-depth review.'" Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin., 772 F.2d 700, 714 (11th Cir. 1985) (quoting Overton Park, 401 U.S. at 415). But

17

"[a]lthough the judicial inquiry should be penetrating, the court is not empowered to substitute its judgment for that of the Secretary." Id.

Section 4(f) of the Department of Transportation Act and § 138 of the Federal-Aid Highway Act, Pub. L. No. 89-575, 80 Stat. 771 (1966), codified as amended at 23 U.S.C. § 138, "are clear and specific directives." Overton Park, 401 U.S. at 411. Together, they provide prescriptions for the construction of federally funded roads and highways through public lands. In particular, § 4(f) of the Department of Transportation Act "evidences Congress'[s] response to growing public concern over the preservation of our nation's parklands, recreation areas, wildlife and waterfowl refuges, and historic sites (also referred to as section 4(f) properties)." Druid Hills, 772 F.2d at 713–14. By enacting § 4(f), "Congress determined that section 4(f) properties should be accorded paramount consideration in connection with all federally financed transportation projects." Id. at 714. The legislators enacted so high a bar because

> in most cases considerations of cost, directness of route, and community disruption will indicate that parkland should be used for highway construction whenever possible. . . . [T]here will always be a smaller outlay required from the public purse when parkland is used since the public already owns the land and there will be no need to pay for right-of-way. And since people do not live or work in parks, if a highway is built on parkland no one will have to leave his home or give up his business.

Overton Park, 401 U.S. at 411–12 (footnote omitted).

18

Section 4(f) is codified at 49 U.S.C. § 303(c).  Regarding the approval of

new programs and projects, it says:

> [T]he Secretary may approve a transportation program or project . . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if --
>> (1) there is no prudent and feasible alternative to using that land; and
>> (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c); see also 23 U.S.C. § 138(a).  The Supreme Court has

recognized that the language of § 4(f) is "a plain and explicit bar to the use of

federal funds for construction of highways through parks -- only the most unusual

situations are exempted."  Overton Park, 401 U.S. at 411.  We must, therefore, put

a thumb on the scale in favor of alternatives that avoid § 4(f) lands.  In order to do

so, this Court has developed a three-part test to review an agency's compliance

with the statute:

> First, we ask whether the Secretary acted within the scope of his authority: did he construe his authority to approve projects to be limited to situations where no feasible and prudent alternatives to the use of 4(f) property existed, and could he have reasonably believed that no such alternatives existed? Second, we inquire whether the Secretary's ultimate decision was arbitrary, capricious, or an abuse of discretion.  Third, we ask if the Secretary followed the necessary procedural requirements.

Citizens for Smart Growth, 669 F.3d at 1216 (citations omitted).  Compliance with procedural requirements was not raised in either party's brief; only the first two inquiries are raised in this appeal.

A.

We begin our analysis, then, with the FHWA's unambiguous determination that there were no feasible and prudent alternatives to the use of § 4(f) lands. "Section 4(f)(1) requires that the Secretary must make a finding that no feasible or prudent alternatives to the use of Section 4(f) lands exist." Id.  When analyzing avoidance alternatives under § 4(f)(1), "the Secretary need not consider options that impact Section 4(f) lands because '[a]n alternate route that also impacts upon parks and historic sites is not an alternative to the use of such property.'" Id. (citation omitted).

Regulations promulgated by the Secretary of Transportation define a "feasible and prudent avoidance alternative" as one that "avoids using Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweighs the importance of protecting the Section 4(f) property." 23 C.F.R. § 774.17.  More specifically, "[a]n alternative is not feasible if it cannot be built as a matter of sound engineering judgment." Id.  An alternative is not prudent if:

> (i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need;

20

(ii) It results in unacceptable safety or operational problems;

(iii) After reasonable mitigation, it still causes:

    (A) Severe social, economic, or environmental impacts;

    (B) Severe disruption to established communities;

    (C) Severe disproportionate impacts to minority or low income populations; or

    (D) Severe impacts to environmental resources protected under other Federal statutes;

(iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;

(v) It causes other unique problems or unusual factors; or

(vi) It involves multiple factors in paragraphs [ ](i) through [ ](v) of this definition, that while individually minor, cumulatively cause unique problems or impacts of extraordinary magnitude.

Id.

In this case, the Final Environmental Impact Statement candidly acknowledged that "all build alternatives, including the Preferred Alternative, use at least one Section 4(f) property; therefore, no feasible and prudent avoidance alternative exists." In making that determination, the Final EIS included a § 4(f) analysis with an extensive discussion of avoidance alternatives for both the SPSP and the AP. The FHWA's determination that no feasible and prudent avoidance alternatives existed included the rejection of Appellants' favored Alternative 6A Spliced as imprudent. Although this alternative was feasible, it was rejected for two distinct reasons: first, because spliced-beam construction was an imprudent

21

construction method for the project; and second, because the path that Alternative 6A would follow was imprudent.

The Final EIS carefully considered different methods of construction and the impact they would have on § 4(f) lands.  Pile-bent construction, which involves the installation of a series of piles using a top-down construction method, would require the placement of piers in the riverbed -- thus using land within the AP.  Spliced-beam construction, which uses multiple prestressed concrete beams to span longer lengths, does not require piers in the riverbed but would require placing footings in the wetlands on the banks of the river that are fifteen times greater than the supports required for pile-bent construction.  Using spliced-beam construction would allow Alternative 6A to completely span the AP and thus avoid § 4(f) land but, on account of the larger footings, it would use more than 67 times as much wetland acreage as pile-bent construction (0.1012 acres versus 0.0015 acres).  The FHWA's preferred Alternative 1C could likewise avoid using the AP if built with spliced-beam construction, but it would use 34 times as much adjacent wetland acreage as pile-bent construction (0.5188 acres versus 0.0154 acres).  Notably, both the Florida Department of Environmental Protection -- the agency with jurisdiction over the AP and the SPSP -- and the South Florida Water Management District "expressed a preference for piers in the AP over additional impacts to any adjacent wetlands."  The agencies' preference for piers in the AP,

22

combined with the fact that the overall impact on adjacent wetland habitats was so much greater with spliced-beam construction, was sufficient reason to deem that construction method imprudent. This conclusion was neither arbitrary nor capricious.

Moreover, Alternative 6A was ultimately rejected as imprudent with any construction because it would have "severe social impacts on both sides of the NFSLR." In considering the various alternatives, the § 4(f) analysis examined six build alternatives as well as several alternatives that would avoid a new crossing of the NFSLR, thereby avoiding the AP. The § 4(f) analysis cross-referenced other sections of the Final EIS that discussed the City's evaluation process. Notably, this process included a scoring system that was designed by the FHWA, the City, and the FDOT. The system included five categories, each with different point totals reflecting their weight in the analysis: (1) meeting the project purpose and need (0–20 points); (2) social and community impacts (0–10 points); (3) natural environment impacts (0–10 points); (4) physical impacts (0–5 points); and (5) project cost (0–5 points). Scoring was done first by an independent team of consultants and then by a panel of officials from the City, the FDOT, and the TPO. Alternative 1C received the highest score on both rounds -- 43/50 and then 39/50 -- while Alternative 6A received the second-highest scores -- 37/50 and then 36/50.

23

This thorough scoring contributed to the City's selection of Alternative 1C as the LPA.

The FHWA's concerns with Alternative 6A stemmed from the route's construction of a new six-lane highway through an established residential neighborhood. As a result of the new road, Alternative 6A would require the second-highest commercial relocations. It would result in the highest number of properties with noise impacts that could not be benefited by a noise wall and would create a "substantial visual impact west of the NFSLR." In fact, it would diagonally bisect neighborhood streets that are laid out on a grid system, thus creating substantial numbers of dead ends, cul-de-sacs, redirected roads, and continuity cuts. It was also the only alternative with the "potential for affecting neighborhoods with a higher than average number of minority households." Of the residential relocations that Alternative 6A would require, 36 percent would be minority households -- the highest percentage of all build alternatives. Alternative 6A would also require relocation of the access road into the La Buona Vita retirement community, which "would change traffic flows within the community, increasing noise and visual impacts." This analysis yielded sound reasons for the FHWA to doubt the prudency of Alternative 6A. Under 23 C.F.R. § 774.17, an alternative is not prudent if it "involves multiple factors . . . that while individually minor, cumulatively cause unique problems or impacts of extraordinary

24

magnitude."  Noting that the "series of negative impacts" that were detailed "would have a collective adverse social impact to the neighborhoods on both sides of the NFSLR," the FHWA found Alternative 6A to be imprudent "even if design and construction issues were resolved."

Appellants nevertheless claim that the FHWA abused its discretion because the record did not establish that the cost or community disruption resulting from Alternative 6A "could possibly or logically rise to the level of 'extraordinary magnitude' and 'unique problems' as required to overcome the Overton Park bar." Based on the analysis we have detailed, we disagree -- the FHWA acted well within its discretion in concluding that the cumulative harms rendered Alternative 6A imprudent.  And to the extent that Appellants suggest that Overton Park's standard replaced or is different from the prudence standard found in § 4(f), that argument is not supported by Overton Park itself.  While Overton Park recognized that "protection of parkland [is] to be given paramount importance," it also acknowledged that "Congress clearly did not intend that cost and disruption of the community were to be ignored."  Overton Park, 401 U.S. at 412–13.  See also, e.g., Safeguarding the Historic Hanscom Area's Irreplaceable Resources, Inc. v. Fed. Aviation Admin., 651 F.3d 202, 208 (1st Cir. 2011) ("The Court's mention of 'truly unusual,' 'extraordinary,' and 'unique' circumstances was intended as a gloss on the application of section 4(f) in a particular type of situation.  Those

25

descriptive terms were never meant to displace the statutory directive that the agency determine whether an alternative is 'prudent.'"); Eagle Found., Inc. v. Dole, 813 F.2d 798, 804–05 (7th Cir. 1987) ("Overton Park was being emphatic, not substituting 'unique' for 'prudent' in the text of § 4(f).").

Moreover, the fact that the FHWA did not expressly use the terms "extraordinary magnitude" or "unique problems" does not render its conclusions arbitrary or capricious. In Citizens for Smart Growth, we concluded that an agency's thorough and detailed explanations "will not be found lacking simply because they did not include the terms 'extraordinary' or 'unique.'" Citizens for Smart Growth, 669 F.3d at 1217. We are not alone in this conclusion. See, e.g., Comm. to Preserve Boomer Lake Park v. Dep't of Transp., 4 F.3d 1543, 1550–51 (10th Cir. 1993) ("The mechanical use of such language in the supporting documents is unrelated to the documents' substantive merit."); Hickory Neighborhood Defense League v. Skinner, 910 F.2d 159, 162 (4th Cir. 1990) ("[T]he fact that the Secretary did not use the terms 'unique' and 'extraordinary' does not compel a finding that he did not comply with section 4(f) and the dictates of Overton Park."); Adler v. Lewis, 675 F.2d 1085, 1095 (9th Cir. 1982) ("Whether or not the reports and studies use the 'magic' terminology, there has been a reasonable and thorough review of a voluminous record."). In this case, the FHWA's analysis was neither arbitrary nor capricious. It fell well within the

26

FHWA's discretion to determine that neither Alternative 6A nor Alternative 6A Spliced was a feasible and prudent alternative to the use of § 4(f) lands in the face of the substantial adverse impact.

### B.

Having concluded that the FHWA acted within the scope of its authority in deciding that no feasible or prudent avoidance alternatives existed, we are required to examine whether the FHWA's ultimate selection of Alternative 1C as the least-harm alternative was arbitrary, capricious, or an abuse of discretion.  See Citizens for Smart Growth, 669 F.3d at 1216.  Section 4(f)(2) requires that, if a determination is made that there is no feasible or prudent alternative, the project must include "all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use."  49 U.S.C. § 303(c)(2).

Regulations promulgated by the Secretary of Transportation clarify that "[a]ll possible planning means that all reasonable measures identified in the Section 4(f) evaluation to minimize harm or mitigate for adverse impacts and effects must be included in the project."  23 C.F.R. § 774.17.  For cases involving "public parks, recreation areas, and wildlife and waterfowl refuges," such measures may include, inter alia, "design modifications or design goals; replacement of land or facilities of comparable value and function; or monetary compensation to

27

enhance the remaining property or to mitigate the adverse impacts of the project in other ways." Id. To evaluate the reasonableness of possible remedial measures, the agency must consider the preservation purpose of the statute and:

> (i) The views of the official(s) with jurisdiction over the Section 4(f) property;
>
> (ii) Whether the cost of the measures is a reasonable public expenditure in light of the adverse impacts of the project on the Section 4(f) property and the benefits of the measure to the property, . . . and
>
> (iii) Any impacts or benefits of the measures to communities or environmental resources outside of the Section 4(f) property.

Id. Notably, "[a]ll possible planning does not require analysis of feasible and prudent avoidance alternatives, since such analysis will have already occurred in the context of searching for feasible and prudent alternatives that avoid Section 4(f) properties altogether." Id.

Under the Secretary of Transportation's regulations, the option that does the "least possible harm" is determined by balancing the following factors:

> (i) The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);
>
> (ii) The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;
>
> (iii) The relative significance of each Section 4(f) property;
>
> (iv) The views of the official(s) with jurisdiction over each Section 4(f) property;
>
> (v) The degree to which each alternative meets the purpose and need for the project;

28

(vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

(vii) Substantial differences in costs among the alternatives.

23 C.F.R. § 774.3(c)(1).  This is "a simple balancing process which totals the harm caused by each alternate route to section 4(f) areas and selects the option which does the least harm."  Druid Hills, 772 F.2d at 716.  Unlike the § 4(f)(1) analysis, "the 4(f)(2) analysis requires the Secretary to consider alternatives that would use 4(f) lands."  Citizens for Smart Growth, 669 F.3d at 1216.  As this Court has previously recognized, § 4(f)(2) means that "[i]f the route does not minimize harm, it need not be selected.  The Secretary is free to choose among alternatives which cause substantially equal damage to parks or historic sites."  Druid Hills, 772 F.2d at 716.

The FHWA was not arbitrary or capricious in its designation of Alternative 1C as the least-harmful alternative.  The § 4(f) evaluation in the Final Environmental Impact Statement included a least-harm analysis as required by § 4(f)(2).  This section again relied on other portions of the Final EIS, and it measured the harms associated with the various build alternatives against the seven factors drawn from 23 C.F.R. § 774.3(c)(1).  First, it considered the ability to mitigate adverse impacts to each § 4(f) resource.  All of the alternatives were equal on this point, because the mitigation plan provided for the addition of 108.55 acres to the SPSP that would more than counterbalance the acreage used by any

29

alternative.  Second, it considered the relative severity of the remaining harm to the protected areas after mitigation.  Again, all of the alternatives were equal, because the mitigation plan would result in a net improvement to natural resources.  Third, it considered the relative significance of each § 4(f) property -- all of the affected properties are important natural communities that provide recreational opportunities, and the AP is additionally an important fish habitat.  Fourth, it considered the views of the officials with jurisdiction over the AP and the SPSP -- in this case, the Florida Department of Environmental Protection, which "agreed that the mitigation plan compensates fully for the impacts and provides substantial benefits to the SPSP."  Fifth, it considered the degree to which each alternative would meet the project's purpose and need and concluded that Alternative 1C met the project's purpose and need more efficaciously than any other alternative.

The least-harm analysis devoted the most time to the sixth factor, the magnitude of adverse impacts from each build alternative on non–§ 4(f) properties after reasonable mitigation.  The report concluded that Alternative 1C would result in "considerably less overall non-Section 4(f) impacts compared with all other build alternatives," because it would not pass near or through any existing neighborhoods on the east side of the river and would be aligned with existing streets on the west side of the river.  While it was the only alternative that would affect the Halpatiokee Trail, the FDEP endorsed a mitigation plan that would

30

relocate the trail entrance and improve the trails, which are "unimproved" or "inundated/flooded most of the year." In sharp contrast, Alternative 6A "would result in the most harm to non-Section 4(f) resources compared with all other build alternatives." As we have already detailed at some length, it would have "the most severe and immitigable social impacts to communities on both sides of the NFSLR" because it would bisect an established residential area, thereby creating substantial adverse impacts on community cohesion and local mobility as well as substantial visual and noise impacts. Alternative 6A was also the only alternative that "ha[d] the potential for affecting neighborhoods with a higher than average number of minority households." Finally, on the seventh factor, costs were determined to be substantially similar for all of the alternatives. Based on these considerations, Alternatives 1F, 2D, 6A, and 6B were eliminated from consideration, leaving only Alternatives 2A and 1C. Alternative 1C was ultimately selected as the least-harm alternative.

This analysis was careful and thoughtful rather than arbitrary and capricious. Section 4(f)(2) does not require the FHWA to avoid parkland at all cost, and the agency could reasonably determine that the severe social costs associated with adopting Alternative 6A far outweigh the social costs of Alternative 1C. While it is true that impacts to § 4(f) resources are greater for Alternative 1C after mitigation -- 2.16 total acres compared to Alternative 6A's 0.01 acre -- a parcel of

31

2.14 acres in the SPSP constitutes less than 0.03 percent of the SPSP's 7,186 acres, and a parcel of 0.02 acres in the AP constitutes less than 0.00068 percent of the AP's 2,972 acres.  And in exchange for using SPSP land, the mitigation plan includes the acquisition of 108.55 new acres (1.5 percent of total acreage) of wetland area for the SPSP.  Moreover, the FDEP -- the agency with jurisdiction over the AP and the SPSP -- worked with the FHWA to evaluate the effects of the alternatives and to design the mitigation plan, which it agrees will fully compensate for any harm done by Alternative 1C.  When the "[c]ollective operational, visual, noise, cohesion, mobility, [ ] access impacts to neighborhoods," and impacts on non–§ 4(f) lands are taken into account, it was reasonable for the FHWA to conclude that Alternative 6A would pose more harms than Alternative 1C.  The FHWA's least-harm analysis was sufficient, its rationale was clearly explained, and its conclusions were reasonable, rather than arbitrary or capricious.

Finally, as required by § 4(f)(2), the FHWA's planning included careful consideration of reasonable measures to mitigate harm.  The Final EIS's § 4(f) evaluation included an eight-page section titled "Measures to Minimize Harm."  In it, harm-minimization efforts were analyzed with respect to each build alternative -- not just for Alternative 1C.  This section first discussed harm-minimization strategies that could be implemented for all build alternatives, which included,

32

inter alia, a reduction in bridge width over natural habitats, use of a top-down construction method, placement of bridge piers to avoid restricting water movement, use of storm-water management systems, use of retaining walls, use of noise-minimization techniques, and use of specialized equipment. The harm-minimization section then considered measures to minimize harm for each individual build alternative. The spliced-beam construction method was analyzed as a potential minimization measure for Alternatives 1C and 6A. It was, again, rejected because "[t]he amount of land used for spliced beam support structures would be far greater than pile bent support structures," causing harm to neighboring wetland habitats.

As part of its planning, the FHWA worked with the City, the Army Corps, the EPA, the NMFS, the SFWMD, and the FDEP to develop a compensatory mitigation strategy that includes two separate focal points. The Proprietary Mitigation Plan would provide compensatory mitigation for obtaining an easement to cross state-owned lands, while the Regulatory Mitigation Plan would provide compensatory mitigation for "unavoidable direct and indirect impacts to wetlands . . . , [sovereignty submerged lands], and navigable and non-navigable waters, as required under federal and state regulations." Collectively, these plans include four water-quality improvement projects, the addition of nearly 110 acres to the affected parkland, rehabilitation of trails and other recreational opportunities, and

33

the maintenance of all acquired lands by the FDEP.  The beneficial effects of these efforts well exceed the potential negative impacts of Alternative 1C, and the care with which they were considered evinces a careful and thorough analysis.

We recognize -- as did the FHWA -- that § 4(f) requires a thumb on the scale in favor of alternatives that avoid the use of § 4(f) lands.  On this ample record, however, we conclude that the FHWA was not arbitrary or capricious in choosing Alternative 1C.  The FHWA made its calculus carefully, giving thoughtful consideration to a wide variety of factors, and it worked with many agencies, even those that once opposed the project, to develop remediation plans that mitigate harms to the affected areas.  Accordingly, we AFFIRM the district court's grant of final summary judgment to the FHWA.

AFFIRMED.